Case 3:20-cv-00096 Document 92 Filed on 11/26/21 in TXSD Page 1 of 12

United States District Court
Southern District of Texas
**ENTERED**
November 26, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| INSURANCE DISTRIBUTION CONSULTING, LLC, § § § *Plaintiff and Counter-Defendant*, § § § VS. § FREEDOM EQUITY GROUP, LLC § § *Defendant and Counterclaimant*. § | CIVIL ACTION NO. 3:20-cv-00096 |

## MEMORANDUM AND RECOMMENDATION

Pending before me is Defendant/Counter-Plaintiff's Motion for Partial Summary Judgment. Dkt. 63. For the reasons discussed below, I recommend that the motion be **DENIED**.

## BACKGROUND

The parties in this case, Insurance Distribution Consulting, LLC ("IDC") and Freedom Equity Group, LLC ("FEG"), are active participants in the life insurance business. IDC provides consulting services. FEG focuses on recruiting and training agents, sales, and marketing.

IDC filed this lawsuit against FEG, seeking to recover sums allegedly owed under a 2012 written contract between IDC and FEG (the "Purported Contract").[1] According to the Amended Complaint, FEG promised in the Purported Contract to pay IDC certain amounts for IDC's "efforts in securing and facilitating new business relationships for FEG and ensuring that FEG received as much

---

[1] IDC alleges that the Purported Contract is between its predecessor, Supreme Alliance LLC, and FEG's predecessor, Freedom Equity Group, Inc. For simplicity's sake, I will refer to the parties to the Purported Contract as IDC and FEG rather than the names of their predecessor entities.

compensation as possible." Dkt. 16 at 4. From the outset of this case, FEG has maintained that the Purported Contract is a forgery. A jury will be required to determine whether the Purported Contract is a forgery. That issue is not before me as part of the Motion for Partial Summary Judgment.

In its Motion for Partial Summary Judgment, FEG asserts that, even if the Purported Contract were valid, IDC cannot, as a matter of law, prevail on its current breach-of-contract claim for two reasons. First, FEG claims the Purported Contract was superseded by a later agreement involving the same subject matter. Second, FEG maintains that IDC may not enforce the Purported Contract after May 5, 2020, the date FEG exercised its right to terminate the Purported Contract.

**The Multi-Party Distribution Agreement**: The agreement that IDC contends replaced the Purported Contract is a Multi-Party Distribution Agreement (the "MPDA") entered into in 2014 between FEG, IDC, and Syncis Insurance Solutions, Inc. ("Syncis"). The MPDA's preamble states that FEG "has a proven track record of successfully recruiting and training agents" and that IDC and Syncis "have the ability to procure top marketing contract(s) with life carriers." Dkt. 63-4 at 2. There is no dispute that FEG entered the MPDA to gain access to Fidelity & Guaranty Life ("Fidelity"), a company that did business with Syncis. In the MPDA, IDC and Syncis agreed to use their best efforts to persuade Fidelity (referred to as "the preferred carrier") to do business with FEG so that FEG's agents could sell Fidelity's products. Importantly, there are no provisions of the MPDA that address any payments due to IDC for its efforts to secure business for FEG.

FEG is quick to point out that Section X of the MPDA states that the MPDA supersedes all prior agreements that involve the subject matter of the MPDA:

> This Agreement, along with its Exhibits, contains the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersedes all prior agreements, discussions, and writings with respect to that subject matter.

*Id.* at 5.

2

**Termination of the Purported Contract**: Although FEG claims that the Purported Contract is a forgery, on May 5, 2020, it went ahead and informed IDC by letter as follows: "In the avoidance of doubt, this letter shall serve as further notice that the contract, if there was one, has been and is terminated by FEG." Dkt. 63-5 at 2.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017)

To defeat a motion for summary judgment, the nonmovant must "present competent summary judgment evidence to support the essential elements of its claim." *Cephus v. Tex. Health & Hum. Servs. Comm'n*, 146 F. Supp. 3d 818, 826 (S.D. Tex. 2015). The nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quotation omitted). Rather, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015). In ruling on a motion for summary judgment, I must construe "the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in that party's favor." *Darden v. Simplicity Fin. Mktg., Inc.*, No. 4:18-CV-1737, 2019 WL 6119485, at *1 (S.D. Tex. Nov. 18, 2019).

## ANALYSIS

### A. DID THE MPDA SUPERSEDE THE PURPORTED CONTRACT?

In the Amended Complaint, IDC alleges that FEG failed to pay it amounts due under the Purported Contract. Assuming, for the sake of argument, the validity of the Purported Contract, FEG maintains that IDC's breach-of-contract claim still fails because the MPDA superseded the Purported Contract.

As mentioned above, FEG, IDC, and Syncis agreed that the MPDA "contains the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersedes all prior agreements, discussions, and writings with respect to that subject matter." Dkt. 63-4 at 5. The MPDA further provides that "[t]his Agreement shall be governed by California law, without reference to rules regarding conflicts of laws." *Id.* at 4.

IDC's position is that the MPDA did not completely supplant the Purported Contract because: (1) the subject matter of the two agreements is not identical; and (2) the parties to the two agreements are not identical. IDC contends that it was trying to assist FEG in obtaining business from Fidelity. But because Fidelity was not willing to enter a direct relationship with FEG, IDC "had to structure the relationship such that FEG's business with Fidelity was conducted through another insurance marketing organization, Syncis." Dkt. 64-1 at 2. The MPDA—which is between IDC, FEG, and Syncis—provides that IDC and Syncis will utilize their best efforts to convince Fidelity to do business with FEG. Critically, the MPDA is completely silent concerning the compensation to be earned by Syncis or IDC under the relationship. IDC contends that there were separate agreements in place that governed: "a) compensation to IDC and/or Syncis from Fidelity; b) compensation to IDC from Syncis; and c) compensation to IDC from FEG." *Id.* IDC claims that the subject matter of the Purported Contract, which is solely between IDC and FEG, is distinct from the MPDA because the Purported Contract is the only agreement that addresses the compensation FEG must pay IDC for its consulting efforts.

4

The purpose of a merger/integration clause is to establish that the parties have agreed that a contract contains the parties' entire agreement. "An integration clause is an express statement that all prior discussions are superseded by (or 'merged' into) the written agreement." *RUI One Corp. v. City of Berkeley,* 371 F.3d 1137, 1148 (9th Cir. 2004) (quotation omitted) (applying California law). Under California law, "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be *contradicted* by evidence of a prior agreement or of a contemporaneous oral agreement." CAL. CODE CIV. PROC. § 1856(a) (emphasis added).

At this stage of the case, I firmly believe that FEG is not entitled to summary judgment on its claim that the MPDA completely replaced the Purported Contract. Although I cannot locate a California case directly on point, there is a wealth of authority from other jurisdictions establishing that merger only occurs when both contracts involve the same subject matter and are between the same parties. *See Gilliland v. Cornell Cos., Inc.*, No. CIV.A.H-07-1655, 2008 WL 4858353, at *7 (S.D. Tex. Nov. 10, 2008) ("In order for two contracts to merge, the subsequent contract: (1) must be between the same parties as the first contract; (2) must embrace the same subject matter; and (3) must have been so intended by the parties."); *Farm Bureau Pol'y Holders & Members v. Farm Bureau Mut. Ins. Co. of Ark.,* 984 S.W.2d 6, 12 (Ark. 1998) ("merger [rule could not] apply because the same parties and the same subject matter [were] not involved"); *Fish v. Tandy Corp.*, 948 S.W.2d 886, 898 (Tex. App.—Fort Worth 1997, writ denied) ("Merger happens when the *same* parties to an earlier agreement later enter into a written integrated agreement covering the *same* subject matter."); *Foote v. Taylor,* 635 P.2d 46, 48 (Utah 1981) ("The general rule is that one contract will not merge into another unless it is plainly shown that that was the intent of the parties; and this is usually where the later contract fully covers an earlier one, but not so unless the two contracts are between the same parties." (footnotes omitted)); *The Nebraskans, Inc. v. Homan,* 294 N.W.2d 879, 881 (Neb. 1980) ("For a merger to take place, the

5

same parties and the same subject matter must be involved."); *Clark v. Compania Ganadera De Cananea, S. A.*, 385 P.2d 691, 695 (Ariz. 1963) ("Merger with respect to the law of contracts refers to the extinguishment of one contract by its absorption into another contract. A preliminary contract, either oral or written, is not merged into a later one unless the two are between the same parties. The parties here were not the same in both instances. The rule therefore prevents the merger." (internal citations omitted)).

Applying these legal principles here precludes the entry of summary judgment. The same parties are not involved in both agreements. While the MPDA is between IDC, FEG, and Syncis, Syncis not a signatory to the Purported Contract between IDC and FEG. And, more fundamentally, I do not think that the two agreements share the same subject matter. The Purported Contract addresses the compensation FEG owes IDC for consulting services. Meanwhile, the MPDA concerns the non-compensation issues surrounding the relationship between FEG, IDC, and Syncis in their efforts to obtain business from Fidelity.

At a bare minimum, there is a factual question that makes summary judgment inappropriate. "In deciding whether an agreement was meant to extinguish the old obligation and to substitute a new one, California courts seek to determine the parties' intent." *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1082 (9th Cir. 2005) (collecting cases). "Determining the parties' intent is a highly fact-specific inquiry" and "[s]uch inquiries are not generally suitable for disposition on summary judgment." *Id.* I thus recommend that summary judgment be denied on FEG's claim that the MPDA supersedes the Purported Contract.

**B.    CAN IDC RECOVER DAMAGES AFTER THE PURPORTED CONTRACT WAS TERMINATED ON MAY 5, 2020?**

FEG argues that IDC is barred from recovery of damages based on the Purported Contract after May 5, 2020. That is the date FEG contends it terminated the Purported Contract in writing.

The Purported Contract provides, in its entirety, as follows:

> You have requested that SA obtained an Insurance Company or Company(s) and worked on a revised strategy for FEG and or its successor(s) that will allow FEG and or its successor(s) to be more focused; create more lasting value; and allow FEG to have more direct control with relationship carrier. An emphasis of the revised strategy should include direct contracts, ability to receive all Service Fees from blocks of business and control Renewals on such block, and when appropriate assist with development of Proprietary Products as well as custom design Marketing Material for Products distributed by FEG and or its successor(s).
>
> In return for SA assistance FEG and or its successor(s) will pay SA 20% of all revenue above 130% on First Year Life production; and a similar 20% on all extra revenue obtained from all renewals and Annuities. This revenue component will apply to all products with Insurance Company or Company(s) chosen, and once fully implemented will never be less than 3% on first year target, 0.3% on excess and for all renewal years for life insurance and 0.2% on annuities.
>
> This agreement was already accepted by you on behalf of FEG in email. However could you also please sign the acceptance below and return to me.

Dkt. 63-10 at 2. On May 5, 2020, FEG's counsel informed IDC's counsel that, to the extent the Purported Contract was valid and enforceable, FEG was terminating the contract effective immediately. *See* Dkt. 63-5 at 2.

As a legal matter, a contract which calls for continuing performance and does not specify any time duration is terminable at will by either party. *See Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 390 (Tex. 1977) ("The rule which we regard as controlling is that contracts which contemplate continuing performance (or successive performances) and which are indefinite in duration can be terminated at the will of either party."); *Citrini v. Goodwin*, 315 S.E.2d 354, 359 (N.C. Ct. App. 1984) ("A contract which contains no definite term as to its duration is terminable at will by either party upon reasonable notice after a reasonable time.") (collecting cases); *Zimco Rests., Inc. v. Bartenders & Culinary Workers Union*, 331 P.2d 789, 793 (Cal. Ct. App. 1958) ("As to contracts contemplating continuing performance for an indefinite time, the general rule is that such contracts are terminable at will by either party.").[2] As the South Carolina Supreme Court succinctly stated more than 100 years ago:

---

[2] The Purported Contract does not include a choice-of-law clause. The parties suggest that Texas, California, or North Carolina law may arguably apply. Whatever the case, the law concerning the termination of the Purported Contract is not appreciably different in any of those states.

7

> Where the parties to a contract express no period for its duration, and no definite time can be implied from the nature of the contract or from the circumstances surrounding them, it would be unreasonable to impute to the parties an intention to make a contract binding themselves perpetually. In such a case the courts hold with practical unanimity that the only reasonable intention that can be imputed to the parties is that the contract may be terminated by either, on giving reasonable notice of his intention to the other.

*Childs v. Columbia*, 70 S.E. 296, 298 (S.C. 1911).

In this case, there is no dispute that the Purported Contract is of indefinite duration and contemplates continuing performance. Indeed, IDC expressly admits in the Amended Complaint that the Purported Contract calls for continuing performance. *See* Dkt. 16 at 7 ("IDC performed and continues to perform its obligations under the contract, including, without limitation, by assisting FEG in developing and maintaining lucrative business relationships with major insurers such as ANICO and Fidelity & Guaranty Life.").

Seeking to avoid summary judgment on any damage claims after May 5, 2020, IDC claims that FEG "cannot terminate the rights that were already vested in IDC." Dkt. 64 at 22. This argument is well-grounded in the law. A "vested right" is commonly defined as a "right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." *Vested right*, BLACK'S LAW DICTIONARY (11th ed. 2019) (sub-definition of "Right"). To be vested, a right must have "become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute." *Harper v. S. Pine Elec. Coop.*, 987 F.3d 417, 422 (5th Cir. 2021) (quotation omitted). Courts have long held that contractual rights that have already vested will not be affected by termination of the contract. *See Tomer v. Tomer* (*In re Tomer*), 128 B.R. 746, 761 (Bankr. S.D. Ill. 1991) ("Even if the debtor's contracts were terminated for failure to meet the personal service requirements of the contracts, the debtor would nevertheless retain his right to payment of vested commissions on policies sold prior to termination."). As one court recently stated:

8

> [O]nce Party A, the "finder" [here IDC] has "found" a client that will send business to Party B [here FEG] the "finder" has fully performed its end of the obligation. And if Party B's obligation is to give a commission to Party A for each subsequent business transaction obtained as a result of the "found" client (*i.e.*, each repair job), it should have to honor that commitment for as long as it continues to receive business form that client.
>
> To hold otherwise would be to say that one party may fully perform on an obligation under the contract, but the other party need not reciprocate with full performance (or, for that matter, *any* performance). In other words, Party A could "find" a client for Party B with the promise of a commission for each job Party B gets from that client, but then Party B could turn around and terminate the contract the next day, shutting Party A out of any commission whatsoever. So Party A has fully performed its end of the contract, but Party B walks away without one scintilla of counter-performance and the law gives Party B a complete pass. The law should not and does not allow that result.
>
> Barring something different in the language of the contract, a commission contract that is deemed "terminable at will" under Illinois law, because it has an infinite duration, should be read to allow commissions *already earned* to continue to be paid. The contract is "terminable" in that one party can cut off the contractual relationship going forward—meaning no more "finding," no more new clients—but *not* cut off an obligation *already* incurred.

*High Concept Holdings, Inc. v. CarMedix, Inc.*, 2019 IL App (1st) 18-0075-U, 2019 WL 2256812, *7 (Ill App. Ct. 2019).

Turning to the facts of the instant case, the question becomes: When did IDC's right to compensation for certain agreements entered into between FEG and various insurance companies ("Third-Party Agreements") vest under the Purported Contract? IDC claims that the Purported Contract's language calling for at least "3% on first year target, 0.3% on excess and for all renewal years for life insurance and 0.2% on annuities" indicates that the payment obligations vested as soon as the Third-Party Agreements were executed. Dkt. 63-10 at 2. As I understand it, FEG's position is that IDC had continuing obligations under the Purported Contract so no rights to compensation for post-May 5, 2020 revenue

9

vested prior to termination. At this stage of the proceedings, I cannot say for certain whether any rights to compensation vested prior to FEG's termination of the Purported Contract. From my perspective, the contractual language at issue is far from definite and conclusive. As such, I recommend that summary judgment on this issue be denied to allow for a more developed record concerning the parties' understanding of the Purported Contract. *See Davis & Tatera, Inc. v. Gray-Syracuse, Inc.*, 796 F. Supp. 1078, 1083 (S.D. Ohio 1992) (finding that whether plaintiff was entitled to post-termination commission based on sales that occurred during her employment to be a jury question).

Although I have determined that FEG is not entitled to summary judgment limiting IDC's recovery of damages for the time period before May 5, 2020, I still want to address a couple of the additional arguments made by IDC. IDC takes the remarkable position that FEG's termination of the Purported Contract is, somehow, a breach of the Purported Contract. To put it mildly, this argument is misguided. As already noted, the general rule is that a contract for continuing performance is terminable at will. IDC's "novel legal argument would make every termination of [a] contract calling for continuing performance a breach of that contract. That is not the law." Dkt. 67 at 5.

Finally, IDC argues that termination of the Purported Contract is prohibited because of the duty of good faith and fair dealing that California reads into every contract.[3] The duty of good faith and fair dealing, IDC asserts, prevents FEG from terminating the Purported Contract because that conduct frustrates IDC's rights to

---

[3] As pointed out above, the Purported Contract does not include a choice-of-law clause. Apparently, an argument can be made that California, Texas, or North Carolina law applies to the Purported Contract. IDC's argument that the duty of good faith and fair dealing prevents FEG from terminating the agreement assumes that California or North Carolina law applies since Texas does not recognize a duty of good faith and fair dealing in every contract. *See Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016) (recognizing that "Texas law does not impose a generalized contractual duty of good faith and fair dealing and, in fact, rejects it in almost all circumstances"). But even assuming California law applies, IDC's argument goes nowhere.

the agreement. This argument is not persuasive. As FEG notes, "termination of an agreement *always* frustrates the other party's realization of continued benefits of the agreement. If applied as IDC suggests, the covenant of good faith and fair dealing would erase *any* right of termination." *Id.* That would be especially significant when, as in this case, the underlying agreement was terminable at will.

Not surprisingly, there is a litany of cases across the country which have held that "[t]he covenant of good faith and fair dealing does not transform a terminable-at-will . . . contract into a terminable-only-for-good-cause contract." *Gould v. Md. Sound Indus., Inc.*, 37 Cal. Rptr. 2d 718, 727 (Cal. Ct. App. 1995) ("Whether [the employer] had a good faith belief in its ground for discharge, or whether it had any ground at all, is irrelevant."). *See also Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 728–29 (10th Cir. 1991) (holding that termination of at-will relationship did not, as a matter of law, breach implied covenant of good faith and fair dealing); *Rockwell Eng'g Co. v. Auto Timing & Controls Co.*, 559 F.2d 460, 462 (7th Cir. 1977) (holding that "contract of indefinite term was terminable at will by either party regardless of the bad faith of the terminating party").

In sum, I am unwilling at this time to conclude, as a matter of law, that IDC is only entitled to damages for conduct that occurred before May 5, 2020. Accordingly, I recommend that partial summary judgment be denied.

## CONCLUSION

For the reasons explained above, I recommend that Defendant/Counter-Plaintiff's Motion for Partial Summary Judgment be **DENIED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 26th day of November 2021.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE